# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

DEBORAH JONES, an Individual,

        Jones,

v.                                 Case No. 3:15-cv-01410-J-34JRK

THE CITY OF JACKSONVILLE,        **DISPOSITIVE MOTION**

        Defendant.

_____/

## DEFENDANT'S MOTION FOR FINAL SUMMARY JUDGMENT AND ACCOMPANYING MEMORANDUM OF LAW

Defendant, CITY OF JACKSONVILLE (the "City" or "Defendant"), by and through the undersigned counsel, moves this Court to enter Final Summary Judgement, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 3.01 of the Local Rules of the Middle District of Florida, in that there are no genuine issues of material fact or law entitling Plaintiff to recover from this Defendant, and states:

1. Plaintiff brought an action against the City[1], alleging age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, and the Florida Civil Rights Act ("FCRA"), § 760.01, *et seq.* Fla. Stat.; sex discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and the FCRA; and retaliation in violation of the foregoing statutes. [Doc. 13].[2]

---

[1]Plaintiff also sued Defendants, the Jacksonville Sheriff's Office ("JSO") and Sheriff Mike Williams, which were subsequently dismissed from the case [Doc. 22].

[2]Deborah Jones ("Jones" or "Plaintiff") instituted this action by filing a seven-count Complaint [Doc. 2] against the City in state court. The City removed the case to this Court [Doc. 1]. Plaintiff filed an Amended Complaint [Doc. 13], changing Count VII to a claim for unpaid wages. Count VII was subsequently dismissed. [Doc. 24].

2.      Specifically, the Plaintiff alleges that Defendant discriminated against her based on gender and age and retaliated against her when she made complaints regarding her supervisor's alleged discriminatory behavior toward her (Doc. 13).

3.      The undisputed sworn testimony and evidence in this case establishes that the Defendant did not discriminate or retaliate against the Plaintiff.

4.      The sworn testimony and evidence in this case establishes that the Defendant had a legitimate, non-discriminatory reason for not calling Plaintiff back to work as a part-time employee and this was not a pretext for age or gender discrimination.

5.      Summary judgment should be granted for Defendant because Plaintiff has failed to establish a *prima facie* case for age or gender discrimination and cannot satisfy her burden of showing that the Defendant's reason was a pretext for age or gender discrimination.

WHEREFORE, Defendant City respectfully requests this Court to enter summary judgment in its favor in the instant case.

## INTRODUCTION

Plaintiff, a former employee of the Jacksonville Sheriff's Office ("JSO"), claims gender and age discrimination on the basis of two, stray statements allegedly made by her supervisor, Dr. Tan Cao, over a period of almost a year. *See* Am. Compl., at ¶¶ 17-40. Even if the Court accepts Plaintiff's version of these comments as true, she is unable to prove her claims. There is no evidence that Dr. Cao's remarks were intentionally directed towards Plaintiff or motivated by discriminatory animus based on her age or gender. Dr. Cao was not a decision-maker with regard to the adverse actions Plaintiff claims she suffered nor could he tangibly affect her employment. Plaintiff also cannot present any evidence of comparators whom the City treated more favorably than her. Plaintiff's claim for retaliation fails because she cannot show a causal

connection between her complaints and the alleged adverse action. Plaintiff also cannot show that JSO's legitimate reason for not scheduling her to work was a pretext for discrimination or retaliation and that age discrimination or her protected activity was the "but-for" reason for the adverse action. Therefore, as there are no genuine issues of material fact in dispute, the City is entitled to judgment as a matter of law.

## I.    FACTUAL BACKGROUND

The uncontested facts in this case are taken from the depositions of: Plaintiff, Tan Cao, M.D., Migdalia Lemarque, Kena Watkins-Brown, Jeffrey Engleskirch, Rieko Higuchi, Ericka Ice, Alvaro Diaz, Janice Plucknett, Chrissy Edmonds, Tara Wildes, Win Tate, Ernst Schinagl, and Katherine Green; the Declaration of Dana Barnes, M.D. (with attached medical records of inmate A.R. and protocols for ETO) and videotapes of the depositions of Tan Cao, M.D. and Plaintiff.[3]

### A.    Jones's Hiring and First Few Months at JSO

In June 2013, Deborah Jones ("Jones") was hired as a Physician's Assistant ("PA") at the jail, JSO's Pre-trial Detention facility, to assist Dr. Tan Cao, a part-time psychiatrist in the mental health department of Health Services. (Deposition Transcript of Deborah Jones, at 22:9-17; 23:21-24:6, attached as Exhibit "A"[4]; Deposition Transcript of Dr. Tan Cao, at 13:23-14:8; 16:24-17:20, attached as Exhibit "B"). Before Jones was hired, Dr. Cao was the only mental

---

[3]Because Dr. Tan Cao is Vietnamese and speaks English with a heavy accent, and there is evidence that the Plaintiff was extremely sensitive, the videotaped depositions of Dr. Cao and the Plaintiff are being provided to show their demeanor, mannerisms, and expressions of speech.

[4]Deposition transcripts are designated by page/line numbers and exhibits attached to the transcript (e.g., "Ex. A, at 10:1-5 and Ex. 1" refers to the deposition transcript designated as Ex. A, at page 10, lines 1-5, and Ex. 1 from the transcript).

health provider at the jail and was having difficulty keeping up with the number of patients.[5] (Cao Dep. 17:21-24; 18:5-20; 45:18-46:5). Chief Alvaro Diaz ("Diaz"), the head of Health Services, made the decision to hire Jones, without any objections or negative comments from Dr. Cao. (Cao Dep. 23:12-24:13; Deposition Transcript of Alvaro Diaz, at 7:11-18:6; 9:25-10:2; 18:5-11, attached hereto as Exhibit "I"). While Jones lacked mental health experience, Chief Diaz anticipated that as a trainee, Jones would work —and learn—under the supervision and license of Dr. Cao, who is Board-certified in psychiatry and has practiced medicine for more than 30 years. (*Id.*, Cao Dep. 7:11-8:19; 10:3-24; 20:10-21:14; 25:2-12; 31:19-32:12; Pl. Dep. 18:23-19:13; 31:14-20).

As a part-time employee, Jones was scheduled to work as needed for JSO operations. (Diaz Dep. 18:12-19:2; Deposition Transcript of Janice Plucknett, 52:1-9; 57:13-60:5; 62:22-63:5, attached as Exhibit "J"). Jones took the job with the understanding that she would not earn leave, had no guarantee of a certain amount of hours or even a permanent job if she finished her training. (Pl. Dep. 24:4-19; 145:6-146:15; 150:24-151:15; Plucknett Dep. 51:4-52:9; 55:19-56:21; 57:13-58:18, Ex. 1). As Jones was a PA trainee in mental health, Dr. Cao decided the parameters of her duties. (Diaz Dep. 33:8-34:6; 35:18-36:10; 37:4-18; 56:16-57:10; 72:18-73:4; 122:15-123:5, Ex. 18; Pl. Dep. 28:17-29:13, Ex. 4). While Florida law states a physician <u>may</u> delegate certain duties to a PA pursuant to a written protocol, since Jones was a professional Dr.

---

[5]The jail also has four to five licensed mental health counselors ("LMHCs") who were not authorized to prescribe medication. (Deposition Transcript of Migdalia Lemarque, at 22:21-23:15; 27:3-21; 111:16-112:6, attached as Exhibit "C"). Nurse practitioners ("ARNPs") and PAs are called "midlevel providers" and may prescribe some, but not all, medication. (Deposition Transcript of Kena Watkins-Brown, at 14:7-13; 20:19-21, attached as Exhibit "D"; Cao Dep. 29:14-16; 38:19-39:5; 108:8-110:9; Pl. Dep. 11:2-10; 27:9-17; Deposition Transcript of Jeffrey Engleskirch, at 28:7-29:25, attached as Exhibit "E"; Deposition Transcript of Rieko Higuchi, at 28:8-20, attached as Exhibit "F"; Deposition Transcript of Ericka Ice, at 22:10-25, attached as Exhibit "G"). PAs and ARNPs both report to a physician, but a PA must work under the license of a physician, who is responsible for reviewing the medication prescribed by the PA. (Pl. Depo 19:2-13; 31-16-20; Watkins-Brown Dep. 14:14-22 15:11-22; 16:8-18; Cao Dep. 29:14-16; 108:8-109:7). Midlevel providers are also subject to and trained on JSO's written protocols. (Declaration of Dr. Dana Barnes, at ¶¶ 9 13, attached as Exhibit "H").

Cao did not believe that all of his instructions had to be in writing. (Diaz Dep. 56:16-58:16, Ex. 7; Cao Dep. 73:2-75:24). Dr. Cao trained Jones primarily on medication management by providing her materials on the subject, answering her questions, and reviewing and critiquing her notes. (*Id.* at 25:18-29:23; 35:23-36:13; 87:16-89:4). After a few months, Dr. Cao noticed that Jones was ignoring his reminders about medication management and continuing "to do it her way." (*Id.* at 31:19-34:1). Dr. Cao counseled Jones on the risks of poor medication management and intervened before patients could be harmed. (*Id.* at 125:7-24).

### B. Jones's First and Second Complaint to Chief Diaz

Since it was Dr. Cao's job to train Jones and she worked under his license, Chief Diaz asked Dr. Cao to report to him on Jones's performance and training. (*Id.* at 31:19-32:12; 37:1-38:14;125:7-126:5). In September 2013, Dr. Cao informed Chief Diaz that Jones was dismissing his advice and seemed bothered by his comments and directions regarding patient care. (Diaz Dep. 84:1-19, Ex. 13). As a result, Chief Diaz met with Jones to discuss her work performance and asked Chrissy Edmonds, Senior Manager of Health Services, to attend and take notes. (*Id.,* and deposition Transcript of Chrissy Edmonds, at 9:16-14:2; 43:8-45:15; 46:9-15, Ex. 1 and 2, attached as Exhibit "K"). During this meeting, Jones complained about Dr. Cao, claiming he was demeaning to her and made disparaging remarks in her presence, including negative remarks about her ability to learn quickly and remember information. (Pl. Dep. 19:13-19; 59:11-61:1; 87:16-88:11; 92:2-22; 95:9-17; 100:13-17; 192:15-193:14, Ex. 9). And also for the first time, Jones complained that she was offended that Dr. Cao said that, "childless women are worthless" and "Divorcees are hoars [sic]." (*Id.* at 41:6-42:25; 113:11-23, Ex. 5 and 9). During that meeting, Jones never alleged that Dr. Cao referred to her as "old" or commented on her age. (Diaz Dep. 105:12-19; 124:13-15; Edmonds Dep. 12:17-23; 51:1-52:18, Ex. 1). On the contrary,

Jones admitted that Dr. Cao's statement was not directed toward her, he did not refer to her by name, and he began the comment by stating how women (plural) were viewed "in his culture, his country…" (Pl. Dep.. at 41:6-42:25; 104:1-105:17; 108:8-24, 113:11-23, Ex. 9). As Jones testified in her deposition, she felt that:

> "[w]ell, in his opinion, women who don't have children and that are past child-bearing years are worthless, so it – and because I didn't have children, I am worthless. . . . He was – he was specific to me. …It was because I was childless, I was worthless. And because I was a divorcee, I was a whore."

(*Id.* at 109:18-109:16). When Dr. Cao mentioned "how desirable young Vietnamese women were" in a group setting, Jones thought he was making a derogatory comment about her. (*Id.* at 55:16-58:17, Ex. 5). Jones felt the reason she was being treated differently was because Dr. Cao liked "younger, prettier" women. (Engleskirch Dep. 45:6-46:3).[6]

Since the reason for the September 2013 meeting was to discuss Jones's clinical performance, which Chief Diaz had been regularly checking on, Chief Diaz counseled her. (Diaz Dep. 84:1-19; 98:12-99:12; 125:11-126:21; 128:24-129:20, Ex. 13 and 18; Deposition Transcript of Tara Wildes, at 66:21-67:22, attached as Exhibit "L"). Chief Diaz noted that Jones had been dismissive of Dr. Cao's orders, was uncomfortable making medical decisions, and was defensive or too sensitive when Dr. Cao spoke to her about work issues. (Diaz Dep. 99:25-100:25; 118:8-17, Ex. 13).[7] After his meeting with Jones, Chief Diaz investigated Jones's complaint by speaking to other members of the mental health team, but no one else substantiated

---

[6]After filing this lawsuit, Jones raised for first time new incidents she never reported to Chief Diaz, including that Dr. Cao brought a calendar to work depicting "scantily" clothed Asian women whom he described as "young, beautiful and desirable." (*Id.* at 46:25-52:6; 133:17-134:6, Ex. 5). Dr. Cao was not turned toward Jones when he spoke and did not use her name when referring to the women or compare them to her, yet "it was pretty apparent" to Jones that by describing the women as attractive, Dr. Cao was implying that she was ugly. (*Id.*) However, there is no evidence that Dr. Cao did anything inappropriate in the workplace. (Cao Dep. 129:3-131:8; 132:21-135:17).

[7]Dr. Barnes, the lead physician over medical services at the jail, also found Jones to be overly sensitive and defensive when she interacted with Jones about patient care. (Barnes Decl. ¶14).

the statement.[8]  (Wildes Dep. 13:16-18; 65:1-12; Ice Dep. 16:24-17:18).   Chief Diaz also questioned Dr. Cao, who denied the statement.  (Diaz Dep. 86:12-15; 87:2-88:12; 90:1-93:25; Cao Dep. 62:9-64:13).   Dr. Cao, who was born in Vietnam and immigrated to the United States 37 years ago, spoke in a group setting about how women in his culture or country were traditionally viewed many years ago.  (Cao Dep. 5:22-6:10; 131:9-132:20).  Nonetheless, Chief Diaz took prompt action by informally counseling Dr. Cao about how he spoke to and interacted with Jones.  (Diaz Dep. 90:4-92:25; Cao Dep. 64:14-67:4).

The only other complaint Jones brought to Chief Diaz's attention regarding Dr. Cao was on February 6, 2014, five months later, when she complained he made a rape comment toward her.  (Pl. Dep. 44:10-45:21; 116:20-119:19, Ex. 10). Again, Jones interpreted a remark made by Dr. Cao as, "I was too ugly to be raped by the inmates and they were only interested in young, beautiful women," not "old, ugly women," and she was "unworthy of being raped."   (Pl. Dep. 50:19-51:10; 86:13-18; 116:20-117:1, Ex. 5 and 10; Diaz Dep. 104:4-12).  Jones complained that Dr. Cao was not a team player, he seemed to get frustrated when she questioned him about the protocol (i.e. dose) for a medication called Tegretol, and she felt "picked on [and] singled out" because Dr. Cao corrected her on the pronunciation of his name.  (Pl. Dep. 119:10-122:7, Ex. 10).  Again, Chief Diaz used the meeting to not only address Jones's complaints, but also her clinical performance, which the Chief believed contributed to their difficult working relationship. (Diaz Dep. 98-12-102:7)  However, referring primarily to Dr. Cao's review/critique of her work, Chief Diaz also noted that Jones seemed to have "excessive sensitivity," and reminded her that she was hired to assist Dr. Cao and it was his responsibility to train her and review her work. (*Id.*; 139:13-140:3, Ex. 15 and 16).  Chief Diaz counseled Jones on "not consulting with Dr. Cao

---

[8] When Jones was hired, the mental health team sat at desks located on the 6th floor of the jail in a noisy, open, bull-pen like area.  (Pl. Dep. 35:6-36:17; 54:17-55:4; Lemarque Dep. 35:15-36:9).

sometimes" and reminded her that "she shouldn't make decisions on her own." (*Id.*) Chief Diaz told Jones that he would "address her concerns with Dr. Cao," and it appeared the rape comment "was not directed to you and seemed to be a joke, but it is still not acceptable in the agency." (*Id.* at 99:25-102:7, Ex. 15 and 16; Pl. Dep. 125:2-125:15). Since it was clear to Chief Diaz that the working relationship between Jones and Dr. Cao had severely deteriorated, he told Jones that to allow the situation to calm down, she would not be scheduled to work the following week. (Diaz Dep. 109:21-113:16). Chief Diaz was not disciplining or "suspending" Jones. (*Id.*) He also wanted a chance to consult with his supervisor, Director of Corrections Tara Wildes, whom he had been keeping apprised of the situation. (*Id.* at 79:2-24; 112:7-113:6; Wildes Dep. 11:21-13:18).

As directed by HR Chief Plucknett, Chief Diaz promptly investigated Jones's second complaint. (Diaz Dep. 119:16-121:4, Ex. 17; Plucknett Dep. 32:14-34:4). Ms. Lemarque, who witnessed the incident, told Diaz that she and Dr. Cao were leaving for the night and asked Jones if she wanted to leave with them because it was dark and potentially dangerous persons may be hanging around the parking lot. (Diaz Dep. 118:13-120:10, Ex. 15, 16 and 18). Ms. Lemarque said the comment was not directed toward Jones. (*Id.*). Chief Diaz understood that Dr. Cao was turned away from Jones when he made the statement. (*Id.*) The next day, Chief Diaz met with Dr. Cao, who stated that the comment was not directed toward Jones or intended to hurt her. (Cao Dep. 67:14-72:18, Ex. 2; Diaz Dep. 116:17-19, Ex. 18; Edmonds Dep. 62:3-69:14; 70:15-71:18; Ex. 1). Dr. Cao explained that he was concerned for the safety of LMHC Lemarque and Jones walking out to their cars after raping incidents outside the jail due to a homeless shelter nearby. (Cao Dep. 70-71). He told them that:

> "pretty women would be target (sic) and the prey for attacker out there, the rapist. But if the rapist finally found that the victim is very ugly like a wicked witch, maybe he will feel discouraged, he wouldn't do anything, and maybe he would walk away."

(*Id.*) Dr. Cao did not know Jones's age and never referred to her as "old." (Cao Dep. 70:9-71:24; 72:19-73:1; 141:2-20, Ex. 2). Again, Chief Diaz immediately took corrective action per JSO's policies[9] by formally counseling Dr. Cao that inappropriate comments, or comments that could be construed that way, had no place in the workplace. (*Id.* at 93:17-95:11; 118:23-119:15; 123:17-124:12, Ex. 17 and 18; Wildes Dep. 61:19-62:16; Cao Dep. 66:13-68:19, Ex. 2). Dr. Cao became very upset and offered to resign. (Diaz Dep. 130:6-131:12). Dr. Cao told Diaz that Jones continued to dismiss his directions. (Diaz Dep. 109:2-16; 128:5-129:20, Ex. 8). Chief Diaz discouraged Dr. Cao from quitting, but directed him to take a week off to cool down. (*Id.*; Cao Dep. 77:11-78:8).

After speaking to both employees, Chief Diaz reconsidered his decision to have them take a week off and instead decided to meet with them in a final effort to repair their professional relationship and refocus their attention on patient care. (Diaz Dep. 115:11-24; 130:6-131:7). (*Id.*) Chief Diaz asked his assistant, Wendy Reynolds, to call Jones and ask her to return to work. (*Id.* at 131:13-137:5, Ex. 19). Jones told Ms. Reynolds that due to her mother's funeral, she could not return until another two weeks. (*Id.*) Jones conceded that if Chief Diaz had called her back to work that week, she would not have considered herself "suspended." (Pl. Dep. 150:14-23). Chief Diaz met with Jones and Dr. Cao on February 25, 2014. (Diaz Dep. 137:14-139:15, Ex. 20). At that meeting, Jones learned that Chief Diaz had spoken to Dr. Cao about her

---

[9] Per JSO's General Orders, corrective action can range from training to informal counseling to suspension, but not all discrimination complaints, even if allegedly serious, have to be sent to Internal Affairs ("IA"). (Plucknett Dep. 21:7-28:12; 40:3-20, Ex. 1 and 2; Wildes Dep. 15:24-16:18; 18:24-19:8; 25:24-26:9; 58:18-59:3; Diaz Dep. 75:15-78:24, Ex. 11). Chief Diaz was instructed to resolve personnel issues at the lowest possible level and was not supposed to send a complaint to IA unless instructed by Director Wildes. (*Id.* at 75:15-78:24).

complaints. (Pl. Dep. 115:5-16; 116:2-19; 127:1-4; 179:13-180:7). Chief Diaz counseled Jones again about not overstepping her boundaries and being dismissive of Dr. Cao's directions and he counseled both parties about the need to be respectful when communicating with each other. (Diaz Dep. 52:18-53:6; 106:11-108:8; 109:1-16; 136:19-137:16 138:14-139:17, Ex. 8, 12 and 20; Pl. Dep. 131:1-132:2, Ex. 10). At the time, Jones believed that Chief Diaz's counseling was appropriate. (*Id.*)

After that meeting, Chief Diaz kept following up with Jones to see how things were going. (Diaz Dep. 128:24-129:10). While Jones claimed that she and Dr. Cao continued to have a difficult working relationship, she never complained to Chief Diaz again and admitted that the comments she reported to him were "two isolated incidents." (Pl. Dep. 59:11-61:1; 84:21-87:10; 134:9-136:18; 144:17-145:5; 182:11-189:15; 192:15-193:14, Ex. 12). Jones allegedly stopped complaining because Chief Diaz "suspended" her, but HR had informed her of other options for filing a complaint. (*Id.* at 179:11-180:7; Plucknett Dep. 13:12-14:1; 31:2-32:4). Neither Chief Diaz nor HR considered Jones suspended. (Diaz Dep. 109:25-110:5; 112:8-114:12, Ex. 15 and 16; Plucknett Dep. 57:13-59:13).

Jones acknowledged that other than the two comments, most of her difficulties with Dr. Cao related to work issues. (Pl. Dep. 182:15-23; 80:15-81:1; 192:15-193:14). The poor work relationship between Jones and Dr. Cao, primarily about work matters, was attested to by several employees, who said that Dr. Cao was occasionally curt, impatient or frustrated with Jones or spoke to her in a condescending tone.[10] LMHC Lemarque felt Jones contributed to the problem by deferring to LMHCs on mental health questions rather than seeking Dr. Cao's guidance.

---

[10]*See* Deposition Transcript of Win Tate, at 39:12-40:1; 44:13-47:8; 55:2-56:11; 62:10-68:20; 85:5-18, attached as Exhibit "M"); Engleskirch Dep. 21:13-19; 31:5-37:22; Deposition Transcript of Ernst Schinagl, at 26:1-27:16; 35:7-12, attached as Exhibit "N"; Deposition Transcript of Katherine Green, at 9:25-14:10, attached as Exhibit "O"; Higuchi Dep. 9:20-11:1; 12:7-20; 25:1-26:4; Ice Dep. 14:5-23; 20:4-21:11).

(Lemarque Dep. 46:15-49:11). Dr. Cao also felt that Jones inappropriately deferred to the LMHCs. (Cao Dep. 129:3-11). Some of the employees stated that the difficulties they observed occurred in 2013 or early 2014. (Green Dep. 21:18-22:9; Schinagl Dep. 51:16-53:9; Higuchi Dep. 46:2-24). ARNP Win Tate only overheard one incident — Dr. Cao reprimanding Jones about a work-related issue involving a patient. (Tate Dep. 9:11-14; 44:13-47:8; 85:5-10).

Only two of Jones fellow employees, LMHC Higuchi and Ernst Schinagl, said they heard a statement directed to Jones by Dr. Cao, which discussed women in his culture or country even though it did not refer to Jones by name. (Schinagl Dep. 19:18-20:3; 29:24-30:7; Higuchi Dep. 10:2-15:7). The only reason they believed the statement was directed at Jones was because Jones was present or having a conversation with Dr. Cao right before the comment was made, or Jones told them Dr. Cao said it to her despite the fact that Dr. Cao was not looking at Jones when he made the comments and he made the statement to a group of people. (*Id.* at 37:20-39:19; 43:16-48:21; Higuchi Dep. 11:10-23; 14:21-15:1; 46:25-47:17; 13:23-15:7; 44:23-45:24). Mr. Schnagl said that Dr. Cao made a comment about a picture on a bathroom wall, which none of the other witnesses, including Jones, mentioned. (Schinagl Dep. 18:22-16). Like Jones, Ms. Higuchi thought that by just referring to attractive women in Jones's presence, Dr. Cao was discriminating against Jones, but Ms. Higuchi never reported this to Chief Diaz or HR even though she is Jones's friend. (Higuchi Dep. 13:23-15:7; 26:5-27:4; 43:18-21; 45:5-24). None of the other employees heard Dr. Cao make remarks of the type Jones reported to Chief Diaz.[11] None of the other older, female employees who worked in the same vicinity as Dr. Cao on a daily basis or anyone else had any problems with him or heard him say anything inappropriate or unprofessional. (*Id.*) None of the witnesses testified that Dr. Cao was having an improper

[11]*See* Engleskirch Dep. 137:16-138:7; Tate Dep. 44:13-47:8; Green Dep. 14:11-21; 17:3-21; 19:23-20:15; Lemarque Dep. 38:20-23; 42:18-44:9; 104:21-105:25; 109:22-110:7; Watkins-Brown Dep. 23:17-24:6; 36:14-21; Ice Dep. 14:2-4; 18:13-19:15; 21:12-22:4; 31:1-32:4; Barnes Decl. ¶ 14.

relationship with anyone at work and only Jones and Higuchi, her friend, claimed that Dr. Cao inappropriately viewed pictures at work. (*Id.*) Moreover, none of the testimony from the employees support a claim of discrimination based on age or sex.

**C.    The ETO Incident and JSO's Decision to Stop Scheduling Jones for Work**

On April 9, 2014, Jones ordered an Emergency Treatment Order ("ETO")[12], the involuntary administration of an injectable antipsychotic, to a 70-year-old inmate. (Wildes Dep. 48:10-50:7, Ex. 2 and 3; LeMarque Dep. 94:10-24; 95:11-19, Ex. 21). Jones took it upon herself to order the ETO without informing Ms. Lemarque, who was going to see the patient with Jones, and without consulting Dr. Cao, even though he was on duty that day and had instructed her not to administer an ETO without his approval.[13]   Ms. Lemarque thought the appropriate treatment, which Chief Diaz later concurred with, was to Baker Act the inmate.[14] Generally, an ETO should only be given if an inmate is a danger to himself or others and should be ordered by or approved by a physician. (Barnes Decl. ¶¶7, 11; Diaz Dep. 43:10-45:17; Lemarque Dep. 77:20-79:19; 89:24-90:16; Ice Dep. 9:4-20).[15]   When Dr. Cao spoke to Jones on the day she ordered the ETO and reminded her that she should consult with him before ordering an ETO, she seemed embarrassed and argued with him. (Cao Dep. 84:11-85:10; 91:8-105:8; 126:6-21, Ex. 4; Pl. Dep.

_____

[12]Fla. Admin. Code R. 65E-5.1703 says a PA should obtain the approval of physician before ordering an ETO or it should be reported to the physician for review within 24 hours. (Pl. Dep. 152:18-153:13, Ex. 16; Cao Dep. 40:14-41:17; 42:25-44:9; 52:13-53:16; Ice Dep. 10:8-11:10). At JSO, it was generally understood that if a physician was on duty, he/she should be consulted before an ETO was ordered. (Barnes Decl. ¶11; Watkins-Brown Dep. 21:24-22:9; 27:17-28:9; 29:24-30:14; 32:13-21; 36:22-37:12;  Tate Dep. 23:8-14; 25:6-20).

[13]*See* Lemarque Dep. 53:8-60:25; 80:9-95:19;102:2-103:24, Ex. 21; Cao Dep. 38:19-39:5; 57:9-60:5; 137:9-18; Pl. Dep. 156:23-161:13, 163:23-165:2, Ex. 17 and 18; Diaz Dep. 32:8-12; 35:15-38:6, Ex. 2 and 6.

[14]*See* Diaz Dep. 43:10-45:17; 46:4-14; 47:5-48:6; 50:1-15; 53:12-56:4; 67:15-68:10; 73:5-74:10, Ex. 6; Barnes Decl. ¶ 6.

[15]Other than doctors, the only midlevel provider authorized to order an ETO if a physician was not around was ARNP Watkins-Brown, who was on call at night. (Barnes Decl. ¶ 11; Diaz Dep. 35:15-38:16). Jones was aware of this directive, but made excuses for her failure to consult Dr. Cao (e.g., he was inconsistent in his instructions and this was not serious because no harm resulted to the patient). (Pl. Dep. 151:16-167:8; Ex. 16 and 18).

161:23-162:25). As a precaution, Chief Diaz decided not to schedule Jones for work until the incident could be investigated. (Diaz Dep. 19:3-21:19; 23:23-24:19; 48:20-51:11, Ex. 2, 4 and 7-9). Chief Diaz requested the opinion of Dr. Cao, Dr. Barnes and other providers with expertise in this area. (*Id.*; Barnes Decl. ¶ 6) Dr. Cao opined that the ETO had the potential to harm the patient given his age, since Jones prescribed it without sufficient knowledge of the patient's medical history and without considering the potential for serious adverse effects. (*Id.* at 29:22-30:8; Cao Dep. 86:4-88:6, Ex. 4 and 5). Dr. Cao believed it was "lucky" the inmate had not been harmed. (*Id.* at 125:1-6). Since the "least aggressive intervention" should be tried first and the inmate had not expressed suicidal or homicidal ideation, Dr. Cao believed the ETO was inappropriate. (Cao Dep. 111:14-122:14, Ex. 3). Dr. Barnes agreed with Dr. Cao's opinion. (Barnes Decl. ¶¶ 6-10). Jones conceded that ordering the ETO may have violated the statute and caused Dr. Cao's license to be sanctioned. (Pl. Dep.167:9-169:3;170:3-10; Cao Dep. 31:19-32:7; 38:21-41:14; 42:25-44:9). In a similar situation, Dr. Cao believed that ARNP Amelia Brown, who was younger than Jones (30's) and also worked under Dr. Cao's license, was not consulting him about medication so JSO stopped scheduling her for work. (Engleskirch Dep. 56:17-58:18; Barnes Decl. ¶ 15).

After almost a year of training and reminding Jones to consult with Dr. Cao, Chief Diaz believed that Jones's actions were serious. (Diaz Dep. 19:3-22:6; 29:22-30:8; 52:18-53:6; Wildes Dep. 24:10-21, Ex. 1-3). Due to the risk to patients and the potential liability to JSO, Chief Diaz consulted with Director Wildes and Chief Plucknett and obtained their approval to stop scheduling Jones for work, but Plucknett did not terminate her. (Diaz Dep. 18:12-19:2; 46:4-14; 49:24-51:23; 140:4-141:4, Ex. 7, 8 and 9; Plucknett Dep. 44:5-47:20; 55:22-57:12; 63:1-64:14; 65:12-25; 66:2-67:18, Ex. 4). Dr. Cao did not recommend Jones's firing and had no

involvement in JSO's decision.  (Cao Dep. 105:9-106:10; 126:22-127:9).  Although Jones knew

that Dr. Cao still worked at JSO, she called JSO multiple times to find out when she could return

to work.  (Pl. Dep. 169:4-16; 181:4-182:10).  JSO did not replace Jones.  (Diaz Dep. 57:12-58:1;

Tate Dep. 58:7-20; 59:23-60:11).

## II.     MEMORANDUM OF LAW

### A.      The City Is Entitled to Summary Judgment on Plaintiff's Gender Discrimination Claims

#### 1.        Plaintiff Cannot Establish a *Prima Facie*  Case

A plaintiff bears the burden of proving that the employer intentionally discriminated

against her unlawfully.[16] *See Harris v. Shelby County Bd. of Educ.*, 99 F.3d 1078, 1082–83 (11th

Cir. 1996). A plaintiff may do so through either direct or circumstantial evidence.  *Id.*   Direct

evidence is that which shows an employer's discriminatory intent "without any inference or

presumption." *A.B.E.L. Servs., Inc.*, 161 F.3d 1330, 1330 (11th Cir. 1998).   "[O]nly the most

blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some

impermissible factor constitute direct evidence of discrimination." *Wilson v. B/E Aerospace, Inc*.,

376 F.3d 1079, 1086 (11th Cir. 2004) (internal citations omitted).  Regardless of which method

is used, the ultimate burden of proof remains with the plaintiff.   *Texas Dep't of Cmty. Affairs v.*

*Burdine*, 450 U.S. 248, 253, (1981).

In this case, even if the Court accepts Jones's versions of Dr. Cao's comments as true, the

remarks were not the type of blatant comments that can only have one meaning, thereby

conclusively proving discrimination without inference or presumption.  Jones cannot show that

the two offensive comments, on their face, made in the presence of others were intentionally

---

[16]Title VII and FCRA claims have the same requirements of proof and use the same analytical framework. *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1271 (11th Cir. 2010). Thus, if the City is entitled to summary judgment on Jones's Title VII claims, it is also entitled to summary judgment on her FCRA claims.

directed to her.  *See Hinson v. Clinch County, Ga. Bd. Of Educ.*, 231 F.3d 821, 828 (11th Cir. 2000) (finding that since decision-maker did not refer to plaintiff when using nickname "Kay Baby," he did not display gender-based animus toward plaintiff).[17]  It is undisputed by Jones and fellow employees that Dr. Cao referred to how "women" (plural) were traditionally viewed in his country or culture many years ago.  Jones also cannot show that Dr. Cao's statements stemmed from a discriminatory motive or that the statements were so objectively offensive that they materially altered the conditions of her employment.  Title VII is not a "general civility code" for the workplace.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); s*ee also  Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998) (Title VII "forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment").  Therefore, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788 (internal citation omitted).  Title VII does not provide protection from someone who is just a "rude and boorish" boss.  *Guthrie v. Waffle House, Inc.*, 460 F.App'x 803, 807 (11th Cir. 2012).  Although Jones and Dr. Cao had a poor working relationship and Dr. Cao may have been impatient, curt, or frustrated with Jones at times, there is no evidence that Dr. Cao's attitude toward Jones was *because of* her gender rather than simply because they did not get along.[18]  Courts have rejected "sex-plus" discrimination when it is based on a neutral factor, such as

---

[17]*See also McCann v. Tillman*, 526 F.3d 1370, 1379 (11th Cir. 2008) (finding that in race discrimination claim, racial epithets spoken by the sheriff were never directed toward plaintiff or spoken in her presence); *see also Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1997) (finding that the "'mere utterance of an ... epithet which engenders offensive feelings in an employee,' ... does not sufficiently affect the conditions of employment to implicate Title VII").

[18]*See Succar v. Dade County Sch. Bd.*, 229 F.3d 1343, 1345 (11th Cir. 2000) (holding that the "harassment of [plaintiff] was motivated not by his male gender, but rather by [the harasser's] contempt for [plaintiff] following their failed relationship; [Plaintiff's] gender was merely coincidental"); *see also Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 962 (11th Cir. 1997) (finding that black supervisor's conduct and attitudes, including that he intimated white employees by his "strut," was not evidence of a discriminatory motive).

marriage and children, which is equally applicable to men and women, as well as so-called "paramour" discrimination.[19]  Thus, even if Jones's subjective interpretation of Dr. Cao's statements was correct — that he had a bias against childless, divorced women and a preference for young, pretty and desirable women — this is not proof that the bias or preference was *because of* sex.

Moreover, the fact that Dr. Cao was not the decision-maker with regard to Jones's employment is fatal to her claim of gender discrimination based on direct evidence.[20]  There is also no evidence that Dr. Cao influenced Chief Diaz, a neutral decision-maker, to show discriminatory animus toward Jones.  *See Perez v. Saks Fifth Ave., Inc.*, 592 F. Supp. 2d 1388, 1399 (S.D. Fla. 2009), aff'd, 379 F. App'x 801 (11th Cir. 2010).  While Chief Diaz obtained Dr. Cao's opinion regarding the ETO incident, he also obtained the opinion of Dr. Barnes and other providers at the jail.  Dr. Cao did not have any involvement in JSO's decision to stop scheduling Jones for work.  Instead, after independently investigating the ETO incident and consulting two other neutral decision-makers, Director Wildes and Chief Plucknett, both of whom are female, Diaz obtained their approval to stop scheduling Jones for work.[21]  Where a supervisor

---

[19] *See Doucette v. Morrison Cty., Minn.*, 763 F.3d 978, 986 (8th Cir. 2014) (finding that gender-neutral comment, which could apply equally to men or women, was not evidence of gender discrimination); *see also*  EEOC Policy Guidance on Employer Liability Under Title VII for Sexual Favoritism, EEOC Notice No. 915–048 (January 12, 1990) ("Title VII does not prohibit ... preferential treatment based upon consensual romantic relationships. An isolated instance of favoritism toward a 'paramour' (or a spouse, or a friend) may be unfair, but it does not discriminate against women or men in violation of Title VII, since both are disadvantaged for reasons other than their genders.")

[20] *See Hinson*, 231 F.3d at 828 (ruling "'stray' comments were, at best, circumstantial evidence of discriminatory motive, particularly when made by non-decisionmaker") (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor J., concurring).  "The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case." *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 10 (1st Cir.1990).

[21] Jones may argue that Diaz's statements when he formally counseled Dr. Cao about the seriousness of his potential conduct is direct evidence.  *See* Statement of Facts ("SOF"), pp. 8-9.  However, the 11th Circuit has said that the statement of lower-level managers who are not responsible for personnel decisions cannot bind the employer. *Zaben v. Air Prod. & Chemicals, Inc.,* 129 F.3d 1453, 1456 (11th Cir. 1997).  Since Diaz had to obtain the approval of

independently reviews the adverse employment decision, a plaintiff would have to show that the supervisor's actions were also due to a discriminatory motive. *See Godby v. March USA*, Inc., 346 Fed. Appx. 491, 493-94 (11th Cir. 2009); s*ee also Pennington v. City of Huntsville*, 261 F.3d 1262, 1270 (11th Cir. 2001). Since Jones cannot make that showing, to survive summary judgment she must prove her case by circumstantial evidence.

In order to set forth a *prima facie* case of intentional discrimination based on gender using circumstantial evidence, a plaintiff must demonstrate: (i) she is a member of a protected class; (ii) she was qualified for the job; (iii) she suffered an adverse employment action under circumstances that raise an inference of discrimination; and (iv) her employer treated similarly-situated employees who are not members of her class more favorably. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *see also Wilson*, 376 F.3d at 1089. Once the plaintiff sets forth a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *Burdine*, 450 U.S. at 254. If the employer articulates a legitimate, non-discriminatory reason, the plaintiff has to show that the reason proffered by the employer was a pretext for discrimination. *Id.* at 255-56; *see also Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000). While Jones is female and would have been qualified for her job after her training had been completed, thus satisfying the first and second prongs, her claim that she suffered an adverse employment action is undercut by claiming almost zero economic damages in this case. *See Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1448-49 (11th Cir. 1998). Jones must demonstrate that she suffered more than just "intimidation, ridicule, and insult" to satisfy the third prong. *See McCann*, 526 F.3d at 1379 (citation omitted). While Jones obviously had "a contentious relationship" with Dr. Cao that does not prove that it had a

---

Wildes and Plucknett to stop scheduling Jones for work and it was Plucknett's decision whether to terminate Jones, Diaz did not have the ultimate responsibility for personnel decisions.

"tangible negative effect" on her employment to justify an adverse action. *Higdon v. Jackson*, 393 F.3d 1211, 1219 (11th Cir. 2004), citing *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001). Jones complains of only two discrete actions by JSO — her alleged "suspension" in February 2014 and not being scheduled for work in April 2014. At any point, JSO had the right to stop scheduling Jones for work for any reason or no reason at all.[22] Likewise, Jones was not suspended or terminated in April 2014. Again, JSO made the decision to discontinue using Jones's services.

Jones is also unable to prove the fourth element of a *prima facie* case – comparators outside her class who were treated more favorably than her. In order to prove discrimination based on circumstantial evidence, a plaintiff must show that she and any comparators are "similarly situated in all relevant respects." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). Where a plaintiff fails to present evidence that similarly-situated employees outside her class were treated more favorably and no other circumstantial evidence of discrimination is present, summary judgment is appropriate. *See Burke–Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323–25 (11th Cir. 2006). As Jones trained under the direct supervision and license of Dr. Cao, she was not similarly situated to any of the other midlevel providers at the jail, whether male or female, who were experienced in their respective areas and not trainees. Jones cannot point to one male comparator whom Dr. Cao treated more favorably than her with regard to any tangible aspect of her job.

In the absence of a comparator, a plaintiff may prove her case by presenting "a convincing mosaic of circumstantial evidence." *Smith v. Lockheed-Martin Corp.*, 644 F.3d

---

[22]Jones was an at-will, part-time employee whose hours were scheduled each week. Jones admitted that the expectation of full-time, permanent employment once she finished her training was never offered to her. *See* SOF, pp. 4, 13. Since Jones was not guaranteed a certain amount of hours or any leave, and her hours were scheduled from week to week, she was not "suspended."

1321, 1328 (11th Cir. 2011) (citation omitted).  In this case, the record is devoid of facts which, if considered in the aggregate, would allow Jones to defeat a motion for judgment.  Instead, the totality of the circumstances proves just the opposite.  Jones only complained twice over a period of nearly a year, and after JSO took prompt, remedial action on her complaints, she never complained again.  Most of the witnesses who testified about Dr. Cao's alleged mistreatment of Jones referred to incidents before Chief Diaz formally counseled him in February 2014, which is evidence that JSO took corrective action.  When JSO stopped scheduling Jones for work, she telephoned multiple times to find out when she would be placed back on the schedule even though she knew that Dr. Cao was still employed with JSO.  If the harassing treatment was as egregious as Jones alleges or Dr. Cao had not modified his behavior after receiving counseling, it is unlikely that Jones would have been eager to return to work under Dr. Cao's direct supervision.  Thus, Jones cannot establish a *prima facie* case of gender discrimination using the "convincing mosaic" standard.

### 2. Plaintiff Cannot Demonstrate Pretext

The defendant's burden to proffer a non-discriminatory reason for its actions is "'exceedingly light'; the defendant must merely proffer non-gender based reasons, not prove them." *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir.1994) (internal citation omitted).  Once the employer proffers a justification, the plaintiff "must show that that a discriminatory reason more likely than not motivated [the employer's]" actions."  *Burdine*, 450 U.S. at 256. A plaintiff can establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'"  *Id.* (emphasis added).  Jones is unable to prove pretext by either method.  Jones cannot point to any similarly-situated males who were treated more favorably than her nor can she point to the biased remarks of decision-makers.

For the reasons stated above, although Jones alleges mistreatment by Dr. Cao throughout her employment, this is not evidence of pretext. The two arguably discriminatory comments did not result in any tangible or material change to the terms and conditions of Jones's employment. By Jones's own admission, the difficult working relationship she had with Dr. Cao related primarily to work matters, not her gender. Jones also cannot show pretext directly by pointing to discriminatory actions taken against other protected class members. Other than Ms. Higuchi, who is not a unbiased witness, none of Dr. Cao's female co-workers heard him make inappropriate or unprofessional gender-related comments. *See* SOF, pp. 10-11. This is further evidence that the poor working relationship between Jones and Dr. Cao was not *because of* gender.

Jones also cannot use the direct method of proving pretext. In order to show pretext, it is insufficient for Jones to merely assert her disagreement with JSO's decision. *See Wilson*, 376 F.3d at 1088. Rather, as the Eleventh Circuit has stated:

> A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute [her] business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason . . .

*Chapman v. Al Transport*, 229 F.3d 1012, 1030 (11th Cir. 2012 ).[23] Among the reasons courts have found as non-actionable under Title VII are nepotism, personal friendship or simply the employer's dislike of a non-protected personal characteristic of the plaintiff. *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1399 (7th Cir.1997). Even where the employer's reasons are shown to be untrue, an inference of discrimination should not be drawn if the employer had an

---

[23]*See also Alvarez*, 610 F.3d at 1264 (provided the employer's motive was not discriminatory, it is not a court's "role to second-guess the wisdom of an employer's business decisions"); *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir.1984) ("[An] employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason").

objectively "honest belief" that the reasons were true at the time it acted.  *See Brill v. Lante Corp.*, 119 F.3d 1266, 1270 (7th Cir. 1997).   Although Jones admitted that she did not consult with Dr. Cao on the ETO and that this could have resulted in his license being sanctioned, instead of "rebutting" JSO's legitimate reason head on, Jones has "quarreled" with the decision by claiming various excuses for her actions, including that the ETO was not serious because the inmate was not harmed.  *See* SOF, at p. 12.  None of Jones's justifications are sufficient to rebut JSO's legitimate decision to stop using the services of a part-time, at will employee who repeatedly failed to follow directions from Chief Diaz and her supervising physician, violated JSO policy and put a patient at risk.  JSO does not have to wait until serious repercussions result before taking preventative action.  Even if JSO was incorrect, Chief Diaz's honest belief, after investigating the ETO incident and obtaining the opinion of Dr. Barnes and other experienced providers (*see* SOF at pp. 12-13), is sufficient reason for a court not to second guess that decision.  Thus, the City is entitled to summary judgment on Jones's gender discrimination claims.

**B.     The City is Entitled to Summary Judgment
on Plaintiff's Age Discrimination Claims**

**1.     Plaintiff Cannot Establish a *Prima Facie* Case**

The analysis set forth above regarding Jones's gender discrimination claims also applies to her age discrimination claims under the ADEA and FCRA.  *See Chapman*, 229 F.3d at 1024. In *Carter v. City of Miami*, 870 F.2d 578 (11th Cir. 1989) (emphasis added) (citation omitted), the court noted:

> This Court has held that not every comment concerning a person's age presents direct evidence of discrimination . . . remarks merely referring to characteristics associated with increasing age, *or facially neutral comments from which a plaintiff has inferred discriminatory intent*, are not directly probative of discrimination.

The record does not support Jones's claim that Dr. Cao called her "old" or made any discriminatory remarks about her age.  *See* SOF, p. 8.  Instead, although younger and older persons as well as women and men may be divorced or childless, Jones's testimony about "women past childbearing age" shows that she *inferred* that Dr. Cao was referring to older women.  Similarly, Jones *presumed* from Dr. Cao's alleged remarks about the desirability or attractiveness of younger women that he was making a derogatory statement about older women. Other than Jones's subjective feelings due to her hypersensitivity, there is no evidence that Dr. Cao was making a discriminatory reference to Jones or any other older woman by his generalized comments about how females were historically viewed in his culture.  This would require the Court to make an inference or presumption that is not supported by the facts.

To prove age discrimination based on circumstantial evidence, Jones must show that she (1) was a member of the protected age group, (2) suffered an adverse employment action, (3) was qualified to perform the job, and (4) was replaced by a younger individual.  *See Benson v. Tocco*, Inc., 113 F.3d 1203, 1207–08 (11th Cir.1997).  "To establish a disparate-treatment claim under the plain language of the ADEA, therefore, a plaintiff must prove that age was the "but-for" cause of the employer's adverse decision."  *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 176 (2009).  The burden of showing that discriminatory animus based on age was the "but for" or motivating factor lies with the plaintiff.  *Id.* at 177-18, 180.  Therefore, even if Jones could prove that her age played a part in JSO's decision, her age discrimination claims could not survive.  Instead, she must show that her age was the "but for" reason JSO decided to stop scheduling her for work.  *Id.*  In light of the absence of any age-related discriminatory remarks by Chief Diaz and the two female decision-makers in this case, Wildes and Plucknett, who are both over 40 years of age, Plaintiff cannot satisfy the "but for" standard.  *See Godby, supra*.

Similar to her gender discrimination claims, Jones cannot establish a *prima facie* case of age discrimination based on circumstantial evidence because she cannot point to similarly-situated comparators outside her protected class whom Dr. Cao treated more favorably than her. The only comparator younger than 40 years of age was ARNP Brown, but Jones cannot show that JSO treated Ms. Brown more favorably than her. *See* SOF, p. 13. Like Jones, JSO stopped scheduling Ms. Brown for work after she failed to consult with Dr. Cao on medication decisions. Jones also cannot show that she was replaced with a person younger than 40 years of age. For the same reasons stated above with regard to Jones's sex discrimination claims, Jones cannot rely on the "convincing mosaic" standard to establish a *prima facie* case of age discrimination.

### 2. Plaintiff Cannot Demonstrate Pretext

For all of the same reasons stated above with regard to Jones's gender discrimination claims, *see Section II.A.2, supra*, Jones cannot prove that JSO's legitimate, non-discriminatory reason to stop scheduling her for work was a pretext for age discrimination. Therefore, the City is entitled to summary judgment on Jones's age discrimination claims.

### C. The City is Entitled to Summary Judgment on Plaintiff's Retaliation Claims

### 1. Plaintiff Cannot Establish a *Prima Facie* Case

In order to establish a *prima face* claim of retaliation, a plaintiff must show: (1) she engaged in a statutorily protected activity; (2) she suffered a materially adverse action; and (3) a causal link between the protected activity and the adverse action. *Raney v. Vinson Guard Serv.*, 120 F.3d 1192, 1196 (11th Cir. 1997). In a Title VII retaliation claim, the plaintiff must also show that "[the] protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. SW Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2520 (2013). Although the City does not dispute that Jones's complaints to Chief Diaz were protected activity, she cannot show a causal connection between her complaints to Chief Diaz and the adverse action she

allegedly suffered. To establish a causal connection, a plaintiff must show that the decisionmaker "was aware of her protected conduct, and that the protected activity and adverse action were not wholly unrelated." *Shannon v. Bellsouth Telecomm., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (citation omitted). A plaintiff may show causation by a close temporal proximity between her protected expression and the adverse action. *Higdon*, 393 F.3d at 1220. While the time period between Jones's last complaint and JSO's decision not to schedule her for work was only 2 ½ months, in the absence of any evidence showing a nexus between Jones's complaints and JSO's decision, she cannot establish causation. Instead, the facts prove just the opposite, namely that Jones's complaints and Diaz's decision in late April 2014 were wholly unrelated. Jones's complaint in September 2013 was seven months before JSO decided to stop using her services. After Jones's last complaint to Chief Diaz in February 2014, she made no other complaints to Chief Diaz about Dr. Cao. Jones conceded that Dr. Cao's remarks were "two isolated incidents" and he made no other remarks of that nature. *See* SOF, p. 10. While Jones claims that she continued to have a difficult working relationship with Dr. Cao, this is not evidence of causation. Rather, it proves that Diaz took prompt, correction action to address Dr. Cao's alleged comments, the gravamen of Jones's complaints. Nothing else tied Jones's last complaint in February 2014 to JSO's decision in late April 2014.

Regardless of whether Jones can show causation, she cannot establish that her alleged protected activity was the "but for" reason for JSO's decision to stop scheduling her for work. *See Nassar*, *supra*. Other than Jones's first complaint in September 2013, her only other complaint was in February 2014. Yet, JSO did not stop scheduling her for work until after the ETO incident, 2 ½ months after her last complaint in April 2014 and almost eight months after she first complained in September 2013. This shows that Jones's complaints were not the

"motivating factor" or the triggering event for the decision not to schedule her for work. Rather, an intervening factor (i.e., the ETO incident) was the "but-for" cause of JSO's decision. As the Supreme Court stated in *Nassar*, *supra*, if a plaintiff is not required to show her complaint was the "but-for" cause of the adverse action, she may try to use her complaints to insulate herself from legitimate discipline or the ramifications of her poor performance. *Id.* In light of the undisputed record and Jones's own admissions regarding the ETO incident, the Court should reject Jones's attempts to use her protected activity as a shield.

## 2. Plaintiff Cannot Show Pretext

A plaintiff claiming retaliation may rebut "the defendant's proffered reason by showing it was merely a pretext to mask retaliatory action. " *Hairston v. Gainesville Sun Pub. Co.,* 9 F.3d 913, 919 (11th Cir. 1993). However, bare assertions or "[c]onclusory allegations" of "retaliation, without more, are insufficient to carry the plaintiff's burden." *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996). For all of the same reasons discussed above, *see Section II.A.2., supra*, there is no genuine issue of material fact as to whether JSO had a legitimate, non-retaliatory reason for not scheduling Jones for work. Jones cannot demonstrate pretext by showing that JSO's "proffered reason is false and that the true reason was retaliatory." *Woods v. Delta Airlines, Inc., et al.*, 595 Fed.Appx. 874, 879 (11th Cir. 2014); *see also Damon v. Fleming Supermarkets of Fla.*, 196 F.3d 1354, 1361 (11th Cir.1999) ("At the pretext stage, the court's concern is not whether the employment decisions were "prudent or fair," but whether unlawful retaliatory animus motivated the adverse decision"). In light of the opinion of neutral providers, such as Dr. Barnes, and Jones's own admissions regarding the ETO incident, Jones's assertion that JSO's decision was retaliatory is merely conclusory. Regardless of whether JSO's decision seems "fair," since Jones cannot prove pretext, the City is entitled to summary judgment on Jones's retaliation claims.

**WHEREFORE**, Defendant, the City of Jacksonville, respectfully requests that the Court enter judgment for the Defendant, that Plaintiff's Amended Complaint in its entirety be dismissed with prejudice and that Plaintiff shall take nothing by way of her Amended Complaint, and for such other relief as the Court deems just and proper.

DATED this 28th day of February, 2017.

Respectfully submitted,

**JASON R. GABRIEL**
**GENERAL COUNSEL**

s/Wendy Byndloss
**WENDY E. BYNDLOSS**
**ASSISTANT GENERAL COUNSEL**
Florida Bar No. 0048718
Primary e-mail: WByndloss@coj.net
Secondary e-mail: BrigetteL@coj.net
**GABRIELLA YOUNG**
**ASSISTANT GENERAL COUNSEL**
Florida Bar No. 0183709
Email:  GYoung@coj.net
Secondary Email: Moffitt@coj.net
OFFICE OF GENERAL COUNSEL
117 W. Duval St., Suite 480
Jacksonville, FL  32202
Telephone: (904) 630-1700
Facsimile: (904) 630-1316

*Attorneys for Defendant, City of*
*Jacksonville*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 28th day of February, 2017, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a copy of the foregoing to James L. D'Andrea, Esq., 3127 Atlantic Boulevard, Jacksonville, FL 32207, email: jdandrea@miltonleach.com; Tad Delegal, Esq., 424 East Monroe Street, Jacksonville, FL 32202, email: tad@delegal.net and James C. Poindexter, Esq., 424 East Monroe Street, Jacksonville, FL 32202, email: james@delegal.net, counsel for Plaintiff.

**JASON R. GABRIEL**
**GENERAL COUNSEL**

/s/Wendy Byndloss
ASSISTANT GENERAL COUNSEL